RANDOLPH, Justice,
for the Court:
¶ 1. In July 2001, Kaye Hankins entered into a home-construction contract with Elite Homes, Inc. (“Elite”). An August 2001 soil-test report on the subject property recommended that “a stabilizing blanket of natural silty clays ... and/or compacted fill soils having a maximum 7-foot thickness” was required “to minimize the Yazoo Clay ... swell or heave potential to within limits tolerable to a strong slab foundation .... ” Hankins received assurances from Elite that the Yazoo clay “was nothing to be concerned about.” She moved into the new home in April 2002. During Hankins’s first year in the home, she reported to Elite numerous cracks, leaks, and difficulties in closing doors and windows. After repeated, unsuccessful home repairs, Hankins commissioned an engineer to study the problems. The engineer reported that the damage to Hankins’s home was caused by “excessive differential movement of the foundation system[,]” that was “most likely due to a combination of both upward and downward [soil] movement,]” which itself resulted from “an increase in moisture content.” One report read that insufficient “thickness of the no-nexpansive silty clay ... fill and natural soil buffer[,]” along with deficient compaction of such material, were inadequate “to minimize differential movements due to seasonal changes in moisture content” and, therefore “contributed to the differential movement experienced by the residence.”
¶ 2. In September 2009, Hankins filed a complaint against Elite in the Circuit Court of Madison County, Mississippi, averring “that the damage which has occurred to said house ... would not have occurred except for the negligence” of Elite. Thereafter, a “Default Judgment” of $645,200 was entered against Elite. In August 2010, Hankins filed a “Suggestion for Writ of Garnishment” against Elite’s commercial general liability (“CGL”) insurer, Maryland Casualty Company/Zurich American Insurance Company (“Maryland Casualty”). In October 2010, a default judgment of $645,200, plus interest, was entered against Maryland Casualty. Subsequently, Maryland Casualty filed a “Motion to Suspend Execution of Default Judgment against Maryland Casualty and For Leave to File Answer to Writ of Garnishment,” which argued, inter alia, that because its CGL policy “excluded] coverage for property damage caused by earth movement,” then it “has no property or effects in its possession belonging to” Elite. Maryland Casualty then filed a “Motion for Summary Judgment” on the same basis. The circuit court, relying upon Rhoden v. State Farm Fire & Casualty Company, 82 F.Supp.2d 907 (S.D.Miss.1998), and Boteler v. State Farm Casualty Insurance Company, 876 So.2d 1067 (Miss.Ct.App.2004), concluded that the “earth movement” endorsement “excludes the damages suffered by [Hankins] from coverage under the policy.” Based thereon, the circuit court granted summary judgment in favor of, and set aside the default judgment against, Maryland Casualty. From that ruling, Hankins appeals.
FACTS
¶ 3. On July 13, 2001, Hankins and Elite entered into a “Contract for the Construction of a Dwelling.”[1] An addendum to the contract provided that:
*648 Buyer understands that expansive sods/ clays have been found to have caused foundation problems in certain areas of Mississippi. Buyer assumes the responsibility of having the subject property tested and/or inspected to determine if expansive soils/clays are present and if foundation damage has been caused thereby. Buyer agrees to hold harmless Seller and all agents or brokers from any and all liability on account of expansive soils or clays.
On August 1, 2001, Engineer Laboratories, Inc., provided a “Materials and Soils Testing” report regarding the subject property. The report provided, in pertinent part, that:
[i]n order to minimize the Yazoo Clay (CH) swell or heave potential to within limits tolerable to a strong slab foundation, the Yazoo Clay (CH) should be covered with a stabilizing blanket of natural silty clays (CL) and/or compacted select fill soils having a minimum 7-foot thickness. In order to provide a necessary buffer zone, the blanket should also extend horizontally at least 7 feet beyond building lines and also 7 feet beyond lower level interior walls. This 7-foot thickness should preferably be established by filling above present surface grades.
(Emphasis added.) According to Han-kins’s subsequently-filed complaint,[2] Elite “assured [her] that the soil test report of Engineer Laboratories, Inc., indicated that what Yazoo clay was under the surface was nothing to be concerned about; and that the tension rods in the foundation would take care of any problems.” On April 22, 2002, Elite conveyed to Hankins the property by warranty deed, and she moved into her new home.
¶ 4. At that time, Elite was the “Named Insured” under a “Precision Portfolio Policy” (“Policy”) with Maryland Casualty.[3] The CGL “Declarations” provided the following “coverages and limits of insurance”: general aggregate — $600,000;[4] products/completed operations aggregate— $600,000;[5] each occurrence — $300,000.[6] The “Residential General Contractor Commercial General Liability Coverage Form” *649 (“Coverage Form”) provided, in pertinent part:
SECTION I — COVERAGES
COVERAGE A. BODILY INJURY AND PROPERTY DAMAGE LIABILITY
I. Insuring Agreement.
a. We will pay those sums that the insured becomes legally obligated to pay as damages because of ... “property damage”[7] to which this insurance applies. We will have the right and duty to defend the insured against any “suit” seeking those damages. However, we will have no duty to defend the insured against any “suit” seeking damages for ... “property damage” to which this insurance does not apply.
[[Image here]]
b. This insurance applies to ... “property damage” only if:
(1) The ... “property damage” is caused by an “occurrence” that takes place in the “coverage territory”;
(2) The ... “property damage” occurs during the policy period....
The Coverage Form further stated that “[vjarious provisions in this policy restrict coverage.” (Emphasis added.) Among the exclusions and limitations was an endorsement entitled “EXCLUSION — INJURY OR DAMAGE FROM EARTH MOVEMENT,” which stated:
[t]his insurance does not apply to ... “property damage” ... arising out of, caused by, resulting from, contributed to, aggravated by, or related to earthquake, landslide, mudflow, subsidence, settling, slipping, falling away, shrinking, expansion, caving in, shifting, eroding, rising, tilting or any other movement of land earth ormud.[8]
With respect to ... “property damage, ” this exclusion only applies to the “products-completed operations hazard. ” [9]
(Emphasis added.)
¶ 5. During Hankins’s first year in the home, she reported to Elite numerous cracks, leaks, and difficulties in closing doors and windows. Elite denied that there were foundation issues. But after multiple, unsuccessful home repairs, Han-kins contacted Structural Solutions, LLC, to evaluate the problem. Structural Solutions determined that the slab foundation *650 on the front of the home had fallen nearly nine inches.
¶ 6. On December 15, 2008, Gary J. Rogers, P.E., of Advanced Engineering Resources, Inc. (“Advanced Engineering”), provided an opinion to Hankins. According to his report:
[biased on our observations, experience and knowledge, it is our opinion that the differential movement observed at the subject structure is most likely due to a combination of both upward and downward [soil] movements. In our opinion, upward soil movement has occurred in the rear portion of the residence footprint as a result of swelling of expansive clay. ... It is our further opinion that downward soil movement has occurred in the front portion of the residence footprint as a result of consolidation. Consolidation of the original soil would have occurred due to the additional weight of fill soil and the residence itself.
(Emphasis added.) The report further opined that the visible damages (cracked walls, leaks, etc.) were “symptoms of the major structural defect[,]” i.e., “excessive differential movement of the foundation system.... ”
¶ 7. On August 20, 2009, W. David Dennis, Jr., P.E., of Burns Cooley Dennis, Inc. (“Burns Cooley”), provided another opinion to Hankins. According to his report:
[f]or a residence supported by a stiffened slab-on grade foundation system, we typically recommend that the bottom of the slab and the ground surface adjacent to the residence be separated from highly expansive clays (CH) by not less than 7 ft of low permeability nonexpan-sive clayey soils to minimize differential movements caused by seasonal shrinking and swelling of the expansive clays (CH).
(Emphasis added.) Three borings of the property revealed “highly expansive clay (CH) soils” at depths of only 5 feet, 2.5 feet, and 6.5 feet. The report added that:
[w]e typically recommend that select fill materials for residence construction be compacted from lifts not exceeding 9 in. in loose thickness to not less than 95 percent of standard Proctor maximum dry density at moisture contents within 3 percentage points of the optimum water content.... [RJelative compactions for the stiff silty clay (CL) fill materials ... range[d] from 87.0 to 94.6 percent and average[d] 90.8 percent.
The Burns Cooley report concluded that:
[i]n our opinion, the residence has experienced differential movement primarily as a result of swelling of the highly expansive clay (CH) soils due to an increase in moisture content. The thickness of the nonexpansive silty clay (CL) fill and natural soil buffer is not adequate to minimize differential movements due to seasonal changes in moisture content. ... In our opinion, the silty clay (CL) fill materials were not placed during original earthwork construction to an acceptable degree of compaction which resulted in a more pervious and compressible fill material that experienced compression upon an increase in moisture content leading to settlement that contributed to the differential movement experienced by the residence.
(Emphasis added.)
¶ 8. On September 15, 2009, Hankins filed her complaint against Elite in the circuit court. According to the complaint, Elite “was negligent in the construction of the ... home and in the preparation of the lot for construction upon which the house was built. [Hankins] further charges ... that the damage which has occurred to *651 said house ... would not have occurred except for the negligence” of Elite.
¶ 9. On March 1, 2010, Hankins filed an “Application to Clerk for Entry of Default and Supporting Affidavit” based upon Elite’s “failure to plead, answer or otherwise defend.... ” Following the “Docket of Entry of Default,” Hankins filed her “Motion for Default Judgment.” On March 15, 2010, the circuit court entered a default judgment, which provided that Elite:
was negligent in the construction of the aforesaid house and in the preparation of the lot for construction upon which the house was built causing the foundation to accidentally fail. The [cjourt further finds ... that the damage which has occurred to said house from the accidental failing of the foundation would not have occurred except for the negligence on the part of [Elite].
On May 17, 2010, the circuit court entered a judgment of $645,200 against Elite.
¶ 10. On August 19, 2010, Hankins filed a “Suggestion for Writ of Garnishment” which provided that Maryland Casualty was “indebted to” Elite for the full amount of the “Default Judgment.” On August 20, 2010, the circuit court entered a “Writ of Garnishment” which provided that Maryland Casualty’s failure to answer within thirty days would “result in a judgment against [it].” On October 1, 2010, Hankins filed an “Application to Clerk for Entry of Default and Supporting Affidavit” based upon Maryland Casualty’s “failure to plead, answer or otherwise defend....” Following the “Docket of Entry of Default,” Hankins filed her motion for default judgment.” On October 4, 2010, the circuit court entered a default judgment, which provided that Hankins was entitled to “the sum of $645,200.00, plus legal interest thereon from the date of the judgment” against Maryland Casualty.
¶ 11. On October 14, 2010, John Hoch-warter, assistant vice-president for Maryland Casualty, filed a “Sworn Declaration on Behalf of Maryland Casualty” which requested suspension of execution of the default judgment. Hochwarter argued that Maryland Casualty “is not indebted to” Elite because the CGL policy “provides no coverage for the allegations of the Complaint in this action.” On October 28, 2010, pursuant to Mississippi Code Section 11-35-31,[10] Maryland Casualty filed a “Motion to Suspend Execution of Default Judgment Against Maryland Casualty and For Leave to File Answer to Writ of Garnishment.” According to Maryland Casualty, “the Policy excludes coverage for property damage caused by earth movement, the alleged cause of the damage to Hankins’[s] home.... Accordingly, Maryland Casualty has no property or effects in its possession belonging to [Elite], and Maryland Casualty is not indebted to [Elite].” On March 15, 2011, Maryland Casualty filed a “Motion for Summary Judgment, or, In the Alternative, for Partial Sum *652 mary Judgment, or, In the Alternative, for a Stay to Conduct Discovery,” which provided that the “earth movement” exclusion “applies to all of the damages which [Han-kins] seeks in this action.”[11]
¶ 12. On March 31, 2011, Hankins filed her “Response to Motion for Summary Judgment and/or Other Relief,” with affidavits of Hankins, Rogers, and Dennis attached thereto. Hankins’s affidavit provided, in pertinent part, that upon moving into the home:
I almost immediately saw it was a disaster. The foundation fell, cracked, crumbled and shattered. Within the first week cracks were running throughout every part of the house; the walls and floor were splitting and cracking and the structure was tearing apart. Although most cracks were clearly visible within two weeks after I moved into this home, all cracks and damages to the house were clearly visible within one month of my purchase of and moving into this home.
Rogers’s affidavit provided that:
[i]t is my opinion that the damage to [Hankins’s] home was caused by the negligence of the builder by placing as little as 2[½] feet of buffer over the expansive clay when the standard of care requires a 7 foot buffer and that the builder was further negligent in failing to properly compact the fill used in the front of the residence. In my opinion the efficient proximate came of the loss to [Hankins’s] home was the negligence of the builder.
[[Image here]]
But for this negligence of the builder, [Hankins] would not have suffered the damages she suffered ... to her home. This was not a natural loss ... [,] this loss was caused by the activities of man failing to follow standards of care as required of all builders.
(Emphasis added.) Substantively, Dennis’s affidavit was nearly identical to that of Rogers.
¶ 13. On July 1, 2011, the circuit court entered an order which granted summary judgment in favor of, and set aside the default judgment against, Maryland Casualty. According to the circuit court, the “core issue” was “whether the subject policy of insurance provides coverage for the damages suffered by [Hankins].” Relying upon Rhoden and Boteler, the circuit court determined that the “earth movement” endorsement “excludes the damages suffered by [Hankins] from coverage under the policy.” As such, the circuit court concluded that Maryland Casualty “does not hold any funds of [Elite] that are subject to the Writ of Garnishment....” From that order, Hankins filed timely notice of appeal.
ISSUE
¶ 14. This Court will consider:
Whether the circuit court erred in granting summary judgment in favor of, and setting aside the default judgment against, Maryland Casualty.
ANALYSIS

Standard of Review

¶ 15. “The interpretation of an insurance policy is a question of law, not one of fact.... When a question of law is raised we apply a de novo standard of review.” Corban v. United Servs. Auto. Ass’n, 20 So.3d 601, 609 (Miss.2009) (inter- *653 nal quotations omitted). Likewise, “[i]n determining whether the trial court properly granted a motion for summary judgment this Court conducts a de novo review of the record.” Palmer v. Anderson Infirmary Benevolent Ass’n, 656 So.2d 790, 794 (Miss.1995).

Introduction

¶ 16. Because of the default judgments, the “factual allegations of [Hankins’s] claim for relief’ are uncontested. Miss. R. Civ. P. 55 cmt. This unique procedural posture simplifies the issue presented to this Court, because the parties do not dispute the presence of “property damage,” the existence of an “occurrence,” or that the circumstances presented implicate the “products-completed operations hazard.” Under this specific set of uncontested facts, we are required to examine the circuit court’s holding that the Maryland Casualty CGL Policy excluded coverage to Elite regarding the “property damage” suffered by Hankins, and that Maryland Casualty has no “property and effects in [its] possession belonging to” Elite. Miss. Code Ann. § 11-35-31 (Rev.2004). As framed by the parties, that decision relies upon interpretation of the “earth movement” endorsement.
¶ 17. The parties do not dispute that earth movement occurred or that Elite, in Maryland Casualty’s words, was negligent; but the parties strongly disagree about the legal implications of these undisputed facts. Maryland Casualty contends that “[t]he fact that [Elite] may have negligently failed to 'prevent the property damage caused by earth movement does not change the fact that earth movement was the cause of such property damage.” (Emphasis added.) As such, Maryland Casualty argues that the “earth movement” exclusion applies. By contrast, Hankins asserts that “the efficient proximate cause of this loss was the negligence of the builder in building this home almost on top of expandable clay and failing to properly compress loose fill....” (Emphasis added.) As such, Hankins maintains that the “earth movement” exclusion is inapplicable, “since the proximate cause of her loss was the negligence of the builder and ... the losses were not caused by natural phenomena.”

(A) Basic insurance principles

¶ 18. In Mississippi, insurance policies are viewed as:
contracts, and as such, they are to be enforced according to their provisions. When parties to a contract make mutual promises (barring some defense or condition which excuses performance), they are entitled to the benefit of their bargain. Thus, insurance companies must be able to rely on their statements of coverage, exclusions, disclaimers, definitions, and other provisions, in order to receive the benefit of their bargain and to ensure that rates have been properly calculated.
Corban, 20 So.3d at 609 (quoting Noxubee County Sch. Dist. v. United Nat’l Ins. Co., 883 So.2d 1159, 1166 (Miss.2004)) (citations omitted). Accordingly, “the appropriate analysis should ... be driven by ... the policy language. The policy either affords coverage or not, based upon application of the policy language to the facts presented.” Architex Ass’n, Inc. v. Scottsdale Ins. Co., 27 So.3d 1148, 1156 (Miss.2010) (citing Corban, 20 So.3d at 609). That analysis is informed by “the substantive contract law of this state,” which includes the following principles:
if a contract is clear and unambiguous, then it must be interpreted as written. A policy must be considered as a whole, with all relevant clauses together. If a contract contains ambiguous or unclear *654 language, then ambiguities must be resolved in favor of the non-drafting party. Ambiguities exist when a policy can be logically interpreted in two or more ways, where one logical interpretation provides for coverage. However, ambiguities do not exist simply because two parties disagree over the interpretation of a policy. Exclusions and limitations on coverage are also construed in favor of the insured. Language in exclusionary clauses must be “clear and unmistakable,” as those clauses are strictly interpreted. Nevertheless, “a court must refrain from altering or changing a policy where terms are unambiguous, despite resulting hardship on the insured.”
Architex Ass’n, 27 So.3d at 1157 (quoting U.S. Fid. & Guar. Co. v. Martin, 998 So.2d 956, 963 (Miss.2008) (internal citations omitted)).

(B) CGL coverage

¶ 19. Today, we are presented with a third-party liability claim against a CGL policy, not a first-party claim for property damage under a homeowners’ policy. See Garvey v. State Farm Fire & Cas. Co., 48 Cal.3d 395, 257 Cal.Rptr. 292, 770 P.2d 704, 705 n. 2 (1989) (“if the in sured is seeking coverage against loss or damage sustained by the insured, the claim is first party in nature. If the insured is seeking coverage against liability of the insured to another, the claim is third party in nature.”) (emphasis in original). As stated by the California Supreme Court:
the right to coverage in the third-party liability insurance context draws on traditional tort concepts of fault, proximate cause and duty. This liability analysis differs substantially from the coverage analysis in the property insurance context, which draws on the relationship between perils that are either covered or excluded in the contract.
Id. at 710. This Court has stated that CGL policies “are designed to provide liability protection for the general contractor and their subcontractors for accidental, inadvertent acts which breached accepted duties and proximately cause damage to a person or property.” Architex Ass’n, 27 So.3d at 1156. See also Garvey, 257 Cal.Rptr. 292, 770 P.2d at 710 (“liability insurance” involves “insuring for personal liability, and agreeing to cover the insured for his own negligence....”). While “[t]he CGL’s insuring agreement grants the insured broad coverage for property damage and bodily injury liability,” such coverage is also “narrowed by exclusions that ‘restrict and shape the coverage otherwise afforded.’ ” Architex Ass’n, 27 So.3d at 1155 (quoting Lamar Homes, Inc. v. Mid-Continent Cas. Co., 242 S.W.3d 1, 10 (Tex.2007) (quoting Weedo v. Stone-E-Brick, Inc., 81 N.J. 233, 405 A.2d 788, 790 (1979))) (emphasis added). See also Nautilus Ins. Co. v. Vuk Builders, Inc., 406 F.Supp.2d 899, 905 (N.D.Ill.2005) (quoting Oakley Transport, Inc. v. Zurich Ins. Co., 271 Ill.App.3d 716, 208 Ill.Dec. 177, 648 N.E.2d 1099, 1107 (1995)) (“Standard commercial liability policies are issued to cover all hazards incident to the operation of a business with the exception of certain excluded risks.”).

(C) The “earth movement” exclusion in Maryland Casualty’s CGL Policy

¶ 20. “[T]he appropriate analysis should .... be driven by ... the policy language.” Architex Ass’n, 27 So.3d at 1156 (citing Corban, 20 So.3d at 609). The endorsement entitled “EXCLUSION — INJURY OR DAMAGE FROM EARTH MOVEMENT” in the Maryland Casualty CGL Policy reads, in pertinent part, that:
[t]his insurance does not apply to ... “property damage” ... arising out of, *655 caused by, resulting from, contributed to, aggravated by, or related to earthquake, landslide, mudflow, subsidence, settling, slipping, falling away, shrinking, expansion, caving in, shifting, eroding, rising, tilting or any other movement of land, earth or mud.
With respect to ... “property damage, ” this exclusion only applies to the “products-completed operations hazard. ”
(Emphasis added.)

(D) Ambiguity, vel non, of the “earth movement” exclusion in Maryland Casualty’s CGL Policy

¶ 21. Preliminarily, this Court notes that “[a] construction leading to an absurd, harsh or unreasonable result in a contract should be avoided unless the terms are express and free of doubt.” Corban, 20 So.3d at 609 (quoting Frazier v. North Miss. Shopping Ctr., Inc., 458 So.2d 1051, 1054 (Miss.1984)). For this Court to limit applicability of the “earth movement” exclusion in Maryland Casualty’s CGL Policy to “nature-caused” or “natural forc[e]” earth movement would be nonsensical. Boteler, 876 So.2d at 1070; Robertson, 352 So.2d at 1310. Unlike first-party homeowners’ policies, “which dra[w] on the relationship between perils that are either covered or exeluded[,]” third-party CGL policies “insur[e] for personal liability, and agre[e] to cover the insured for his own negligence.” Garvey, 257 Cal.Rptr. 292, 770 P.2d at 710 (emphasis added). See also Architex Ass’n, 27 So.3d at 1156 (CGL policies “are designed to provide liability protection for the general contractor and their subcontractors for accidental, inadvertent acts which breached accepted duties and proximately cause damage to a person or property.”). For a third-party CGL policy, under which an “occurrence” (i.e., “an accident”) that causes “bodily injury” or “property damage” is a prerequisite to coverage, what would be the purpose of an “earth movement” exclusion limited to nature-caused or natural-force earth movement? Unlike the dissent, we decline to erroneously conflate first-party homeowners’ policies pertaining to property damage and third-party CGL policies in this regard.[12]
¶ 22. Even if we were to consider prior Mississippi rulings that address “earth movement” exclusions in first-party homeowners’ policies (i.e., New Hampshire Insurance Company v. Robertson, 352 So.2d 1307 (Miss.1977); Rhoden, 32 F.Supp.2d at 907; and Boteler, 876 So.2d at 1067), our decision would be no different.

New Hampshire Ins. Co. v. Robertson

¶ 23. In Robertson, a homeowner suffered “settling and cracking of ... [her] patio, walls, floors and related damages[,]” following “an underground leak caused by separation of a hot water line.” Robertson, 352 So.2d at 1309. It was undisputed “that the damage resulted from water pressure exerted upon the foundation or slab of the house and ultimately upon the floors and walls or from earth movement beneath the foundation of the house, or a combination, all of which was caused by the underground leak.” Id. The “comprehensive dwelling insurance policy” issued by New Hampshire Insurance Company (“New Hampshire”) excluded “settling, cracking, shrinking, bulging or expansion of pavements, patios, foundations, walls, floors, roofs or ceilings; ... (b) caused by, resulting from, contributed to or aggravated by earthquake, volcanic eruption, land *656 slide, or other earth movement ....” Id. at 1308-09 (emphasis added). But the policy-provided coverage for damage caused by leaking plumbing. See id. at 1309-10.
¶ 24. Following denial of her insurance claim, the homeowner filed suit against New Hampshire, and the lower court held that her loss “was within the coverage of the policy....” Id. at 1308. On appeal, this Court affirmed. See id. at 1312. This Court determined that the “earth movement” exclusion was ambiguous and construed it against its drafter, New Hampshire. See id. at 1310-12. This Court stated that “[t]he provision excluding loss by any other earth movement appears in the context of a clause dealing with earthquakes, volcanic eruption, and landslides. In this context, it would appear to be limited to ‘earth movement’ resulting from natural forces (as opposed to earth movement resulting from the water leak).” Id. at 1310 (emphasis added). This Court added that holding otherwise would improperly “negate the specific coverage of water damage resulting from leakage within a plumbing system.” Id. at 1310-11.

Rhoden v. State Farm Fire & Cas. Co.

¶ 25. In Rhoden, homeowners “began to notice cracks in their driveway and in their bathroom tile” approximately ten years after moving into their home and five years after the completion of an addition to the home. Rhoden, 32 F.Supp.2d at 908. The homeowners sued their building contractor alleging that “failure to properly design, construct, prepare, and fill lots, as well as ... failure to properly design and construct the foundations of the houses on the lots, caused movement of the earth),]” which “caused instability to the structure of their home.” Id. The homeowners also submitted an insurance claim to their homeowners’ policy insurer, State Farm. See id. at 909.
¶ 26. State Farm denied the first-party claim, based, in part, on an “earth movement” exclusion,[13] and the homeowners filed suit against State Farm for “wrongfully den[ying] their claim for damage and loss to their home.” Id. at 909. The district court determined that:
the language in the policy in the present case is different than the language in Robertson. Where the court in Robertson found the policy to be ambiguous such that the Court had to deduce the meaning and extent of the settling/cracking and earth movement exclusions from the context of these exclusions, in the present case, the policy is not ambiguous as to the extent and meaning of the ‘earth movement’ exclusion.
Id. at 912 (emphasis added). Under the State Farm “earth movement” exclusion, the district court concluded that:
whether caused by the negligence of Plaintiffs contractor in its placement of fill soil in the construction of Plaintiffs’ *657 home or by some other condition, Plaintiffs’ damages are a result of earth movement underneath the residence. As such, they fall within the “earth movement” exclusion of the policy and are not covered damages. Because as a matter of law, Plaintiffs’ damages are not covered under the policy, Defendant is entitled to summary judgment.
Id. at 913 (emphasis added).

Boteler v. State Farm Cas. Ins. Co.

¶ 27. In Boteler, a homeowner suffered structural damage to his home after his foundation shifted. Boteler, 876 So.2d at 1068. “A broken pipe that was leaking water when the damage was discovered may have been the cause of the shifting, or the damage to the pipe may have been the result of shifting that arose from other causes.” Id. The homeowner submitted a first-party insurance claim to State Farm, which was denied based on an “earth movement” exclusion.[14] See id. at 1068. The homeowner then filed suit against State Farm for breach of contract, and the circuit court granted summary judgment in favor of State Farm. See id.
¶ 28. On appeal, the Mississippi Court of Appeals affirmed. See id. The Court of Appeals determined that “the policy language in the case we resolve today and that in the 1977 Robertson case are strikingly dissimilar. Ambiguities in insurance contracts are read to favor the insured, but that principle does not permit the creation of ambiguity where there is none.” Id. at 1069. Relying upon Rhoden, the Court of Appeals determined that:
Robertson analyzed a specific contract provision relating to earth movements. That precedent does not then become a barrier to exclusion of damages from earth movements if a different contract uses different language that adequately creates the exclusion. Unambiguous language of the exclusion was used by State Farm.... The circuit judge found that there was no liability for damages regardless of whether nature-caused or human-source earth shifting was the reason for the damage. We agree.
Id. at 1070.
¶ 29. The “earth movement” exclusion in the Maryland Casualty CGL Policy is far more akin to the “earth movement” exclusions in the first-party homeowners’ policies in Rhoden and Boteler, than to the “earth movement” exclusion in the first-party homeowners’ policy in Robertson.
¶ 30. Robertson is fundamentally distinguishable, because the homeowners’ policy in that case provided coverage for damage caused by leaking plumbing (i.e., the cause at issue). See Robertson, 352 So.2d at 1309. In refusing to “negate” that “specific coverage,” this Court determined the existence of a clear ambiguity between coverage for that peril and the “earth movement” exclusion. Id. at 1310-11. Furthermore, the “earth movement” exclusion in the Maryland Casualty CGL Policy is “strikingly dissimilar” to the exclusion in Robertson, as it adds the modifiers “arising out of’ and “related to,” then denominates multiple other excluded forms of “earth movement,” including “shrinking,” “expansion,” “shifting,” “rising,” and “tilting.” Boteler, 876 So.2d at 1069. These additions are significant because “[w]hen terms in an insurance policy have been interpreted by prior judicial decisions *658 in a particular way, it will be assumed that the insurer was aware of these interpretations .... ” Winters v. Charter Oak Fire Ins. Co., 4 F.Supp.2d 1288, 1294 (D.N.M.1998). See also Nautilus Ins., 406 F.Supp.2d at 904.
¶ 31. While the “earth movement” exclusion in the Maryland Casualty CGL Policy is not as expansive as the “earth movement” exclusions in Rhoden and Boteler, insofar as it does not include similar lead-in language or an ACC clause,[15] this Court finds that it is still “not ambiguous as to” its “extent and meaning” and “adequately creates the exclusion.” Boteler, 876 So.2d at 1070; Rhoden, 32 F.Supp.2d at 912. In the “products-completed operations hazard” context, the Maryland Casualty CGL Policy “narrowed” coverage by “clear[ly] and “unambiguous[ly]” excluding “property damage” that was, inter alia, “contributed to, aggravated by, or related to ... shrinking, expansion ... shifting, ... rising, [or] tilting ... of land, earth, or mud.”[16] Architex Ass’n, 27 So.Bd at 1155, 1157 (internal citations omitted). That exclusion “must be interpreted as writtenf,]” as insurers should “be able to rely on their statements of coverage, exclusions, disclaimers, definitions, and other provisions, in order to receive the benefit of their bargain and to ensure that rates have been properly calculated.” Id. at 1157 (quoting Martin, 998 So.2d at 963); Corban, 20 So.3d at 609 (quoting Noxubee County Sch. Dist., 883 So.2d at 1166). While “[ajmbiguities in insurance contracts are read to favor the insured, ... that principle does not permit the creation of ambiguity where there is none.” Boteler, 876 So.2d at 1069. In the present case, this Court concludes that a finding of ambiguity would impermissibly strip an unambiguous CGL policy exclusion of its effect.[17] See Architex Ass’n, 27 So.3d at 1157 (quoting Martin, 998 So.2d at 963) (“a court must refrain from altering or changing a policy where terms are unambiguous. ...”).
¶ 32. Hankins (the homeowner), Elite (the general contractor), and Maryland Casualty (the CGL insurer for Elite) each was aware of the “earth movement” risk inherent in building a home on Yazoo clay.[18] Yet only Hankins and Elite chose to assume that risk. Maryland Casualty *659 avoided assumption of that risk in the “produets-completed operations hazard” context by “narrowfing]” its CGL coverage through the “earth movement” exclusion. Architex Ass’n, 27 So.3d at 1155. Applying the plain language of that specific exclusion to the undisputed facts, this Court concludes that there is “no genuine issue as to any material fact and [Maryland Casualty] is entitled to judgment as a matter of law.” Miss. R. Civ. P. 56(c); South Carolina Ins. Co. v. Keymon, 974 So.2d 226, 231 (Miss.2008). The Advanced Engineering report provided that the “property damage” suffered by Hankins was a “sympto[m]” of “excessive differential movement of the foundation system[,]” which was itself “most likely due to a combination of both upward and downward [soil] movements.” (Emphasis added.) The “upward soil movement” was attributed to “swelling of expansive clay .... ” (Emphasis added.) The Burns Cooley report similarly concluded that “the residence has experienced differential movement primarily as a result of swelling of the highly expansive clay (CH) soils due to an increase in moisture content.” (Emphasis added.) Accordingly, there is no dispute that the “property damage” which Hankins suffered was “contributed to, aggravated by, or related to ... shrinking, expansion ... shifting, ... rising, [or] tilting ... of land, earth, or mud.” Since Hankins’s “property damage” is “a result of earth movement underneath the residence[,]” it “fall[s] within the ‘earth movement’ exclusion of the policy and [is] not covered.... ” Rhoden, 32 F.Supp.2d at 913.
CONCLUSION
¶ 33. This Court finds that Maryland Casualty’s “earth movement” endorsement is unambiguous, and operates to exclude the “property damage” suffered by Han-kins from coverage under the CGL Policy. In the absence of such coverage, Maryland Casualty has no “property and effects in [its] possession belonging to” Elite. Miss. Code Ann. § 11-35-31 (Rev.2004). Accordingly, this Court affirms the Circuit Court of Madison County’s order granting summary judgment in favor of, and setting aside the default judgment against, Maryland Casualty.
¶ 34. AFFIRMED.
CARLSON AND DICKINSON, P.JJ., LAMAR AND PIERCE, JJ. CONCUR. WALLER, C.J., DISSENTS WITH SEPARATE WRITTEN OPINION JOINED BY KITCHENS AND CHANDLER, JJ. KING, J., NOT PARTICIPATING.

. The purchase price was $267,000, with an additional $34,967.81 for “extra items and improvements. ’ ’

. The Appellee’s Brief of Maryland Casualty provides that "[bjecause [Maryland Casualty] was brought into this case as garnishee after a default judgment was entered against its insured, [Elite], and no discovery was ever taken, the facts of this case are those alleged in the Complaint, including the exhibits thereto.” See Miss. R. Civ. P. 55 cmt. ("Once the default is established, defendant has no further standing to contest the factual allegations of plaintiff's claim for relief.”).

. Elite also had been the named insured under a policy with Maryland Casualty from April 3, 2001, to April 3, 2002. On June 27, 2002, the Policy was cancelled for the stated reason that Elite was "out of business.” However, the Policy provided that "bankruptcy or insolvency of the insured ... will not relieve us of our [CGL] obligations.... ”

. The Policy stated that "[t]he General Aggregate Limit is the most we will pay for the sum of: ... b. Damages under Coverage A [‘Bodily Injury and Property Damage Liability'], except damages because of ... ‘property damage’ included in the ‘products-completed operations hazard’....”

. The Policy provided that “[t]he Products-Completed Operations Aggregate Limit is the most we will pay under Coverage A for damages because of ... ‘property damage’ included in the 'products-completed operations hazard.' ”

. The Policy defined an "occurrence” as "an accident, including continuous or repeated exposure to substantially the same general harmful conditions.” The Policy stated that, under either the General Aggregate Limit or the Products-Completed Operations Aggregate Limit, "the Each Occurrence limit is the most we will pay for the sum of: a. Damages under Coverage A ... because of all ... 'property damage' arising out of any one ‘occurrence.’ ”

. The Policy defined "property damage,” in pertinent part, as:
a. Physical injury to tangible property, including all resulting loss of use of that property. All such loss of use shall be deemed to occur at the time of the physical injury that caused it; or
b. Loss of use of tangible property that is not physically injured. All such loss of use shall be deemed to occur at the time of the "occurrence” that caused it.

. This Court notes that this "earth movement" exclusion does not include an "anti-concurrent causation” ("ACC”) clause.

. Hankins and Maryland Casualty both state that the "products-completed operations hazard" requirement is "satisfied” in this case. The Policy defined "[pjroducts-completed operations hazard” to include "all ... 'property damage’ occurring away from premises you own or rent and arising out of ... ‘your work'.... ” The parties do not dispute that the "work” of Elite is at issue and, additionally, the Policy provided that “ 'your work’ includes: a. Warranties or representations made at any time with respect to the fitness, quality, durability, performance or use of ‘your work’.... ” Finally, the Policy stated that ‘‘[w]ork that may need service, maintenance, correction, repair or replacement, but which is otherwise complete, will be treated as completed.” As discussed in ¶¶ 5, 12 infra, Hankins was living in her home when she discovered the "property damage.” Therefore, the “products-completed operations hazard” is applicable.

. Mississippi Code Section 11-35-31 provides:
[i]f a garnishee, personally summoned, shall fail to answer as required by law, or if a scire facias on a judgment nisi be executed on him, and he fail to show cause for vacating it, the court shall enter a judgment against him for the amount of plaintiff's demand; and execution shall issue thereon, provided, however, that the garnishee may suspend the execution by filing a sworn declaration in said court showing the property and effects in his possession belonging to the debtor, and his indebtedness to the debtor, if any, or showing that there be none, if that be true; and by such act and upon a hearing thereon, the garnishee shall limit his liability to the extent of such property and effects in his hands, and such indebtedness due by him to the debtor, plus court costs and reasonable attorney’s fees of the judgment creditor in said garnishment action.
Miss.Code Ann. § 11-35-31 (Rev.2004) (emphasis added).

. Alternatively, Maryland Casualty sought "partial summary judgment limiting its potential liability to the property damage, if any, which occurred during [the] applicable policy period of April 3, 2002 to June 27, 2002.... [Potential liability is further limited by the Maryland Casualty policy’s liability limit of $300,000 per occurrence.”

. The dissent relies largely upon Murray v. State Farm Fire & Casualty Company, 203 W.Va. 477, 509 S.E.2d 1 (W.V.1998), a case involving a first-party homeowners' policy. See id. at 7, 12. The Murray Court likewise relied on cases involving first-party claims. See id. at 9 n. 6.

. The State Farm "earth movement” exclusion read, in pertinent part, that:
2. We do not insure under any coverage for any loss which would not have occurred in the absence of one or more of the following excluded events. We do not insure for such loss regardless of: (a) the cause of the excluded event; or (b) other causes of the loss; or (c) whether other causes acted concurrently or in any sequence with the excluded event to produce the loss; or (d) whether the event occurs suddenly or gradually, involves isolated or widespread damage, arises from natural or external forces, or occurs as a result of any combination of these:
[[Image here]]
b. Earth Movement, meaning the sinking, rising, shifting, expanding or contracting of earth, all whether combined with water or not. Earth movement includes but is not limited to earthquake, landslide, mudflow, sinkhole, subsidence and erosion.
Rhoden, 32 F.Supp.2d at 911.

. While the quoted portions of the State Farm “earth movement” exclusion in Boteler were identical to the "earth movement” exclusion at issue in Rhoden (see n. 13 supra), it is unclear whether it also provided that “[ejarth movement includes but is not limited to earthquake, landslide, mudflow, sinkhole, subsidence and erosion.” Boteler, 876 So.2d at 1068-69.

. Other courts have recognized that State Farm “uses unique language in the 'Losses Not Insured’ section of its policy (which includes the earth movement exclusion), language not employed by other insurance companies in standard all-risk policies." Murray, 509 S.E.2d at 13 (emphasis added). See also Winters, 4 F.Supp.2d at 1292; Sentinel Assocs. v. Am. Mfrs. Mut. Ins. Co., 804 F.Supp. 815, 819 (E.D.Va.1992); Lee R. Russ & Thomas F. Segalla, 11 Couch on Insurance 3d §§ 153:67, 153:96 n. 4 (2006).

. This Court finds the limitation of the "earth movement” exclusion to “products-completed operations hazard” to be significant. In effect, it contractually prevents the Maryland Casualty CGL Policy from operating as a performance bond in that specific context. But because the “earth movement” exclusion applies only to "products-completed operations hazard,” then it would not apply in a situation during the course of construction where, for instance, "equipment ... hits ... an embankment next to a house ... causes the earth to move and thereby damages the house.” Wyatt v. Northwestern Mut. Ins. Co., 304 F.Supp. 781, 783 (D.Minn.1969).

. We reject the dissent’s position that ‘‘[wjithout the qualifying language” provided in the first-party homeowners’ policies in Rhoden and Boteler, then "the policy is ambiguous.” (Waller Op. at ¶ 44). Not only does this categorical approach risk manufacturing ambiguity "where there is none[J” but it also fails to distinguish the differences between a CGL and homeowners’ insurance policies, as discussed in ¶21 supra. Boteler, 876 So.2d at 1069.

. Hankins was notified of this risk, at the latest, in the addendum to her "Contract for Construction of a Dwelling” with Elite, and acted upon such by procuring a "Materials *659 and Soils Testing" report on the subject property. Elite was aware of this risk, yet assured Hankins that it "was nothing to be concerned about...." Maryland Casualty's awareness of this risk is evidenced by the "earth movement” exclusion included in the CGL Policy.